PARTIDO POPULAR DEMOCRÁTICO, recurrente, *v.* GERINELDO BARRETO PÉREZ, ADMINISTRADOR, COMISIÓN ESTATAL DE ELECCIONES, recurrido; PARTIDO SOCIALISTA PUERTORRIQUEÑO, recurrente, *v.* GERINELDO BARRETO PÉREZ, recurrido.

*Números:* O-80-619, O-80-621 *Resueltos:* 14 de noviembre de 1980

*José A. Andreu García, Manuel E. Andreu García* y *Miguel D. Lausell,* abogados del Partido Popular Democrático, recurrente; *Juan Mari Bras, Ludmilia Rivera Burgos* y *Héctor M. Collazo,* abogados del Partido Socialista Puertorriqueño, recurrente; *Miguel A. Pagán, Eunice Sein Llompart* y *José A. Carlo,* abogados de Gerineldo Barreto Pérez, Administrador de la Comisión Estatal de Elecciones, recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Evaluamos los méritos de esta controversia teniendo presente el exordio de la Asamblea Constituyente de que "[e]l poder público tiene no sólo el derecho, sino la responsabilidad de proteger el proceso ordenado de transformación, evolución y cambio con arreglo a la voluntad general, según ella se exprese periódicamente en las urnas". *Diario de Sesiones de la Convención Constituyente,* ed. 1961, pág. 2562.

I

Ambos recursos esencialmente cuestionan la juridicidad del dictamen emitido por la Junta Revisora Electoral, que ordenó al Administrador de la Comisión Estatal de Elecciones

publicar "en forma oficial el resultado de las elecciones celebradas el 4 de noviembre de 1980, una vez se termine de contar el voto ausente independientemente de lo que pueda surgir del Escrutinio General y/o cualquier impugnación de las elecciones".

Tiene su génesis la controversia planteada, en un acuerdo unánime de dicha Comisión adoptado en reunión extraordinaria al día siguiente de las elecciones —al amparo de lo dispuesto en el Art. 6.007 de la Ley Electoral de Puerto Rico, Núm. 4 de 20 de diciembre de 1977 (16 L.P.R.A. sec. 3267)— de publicar los resultados preliminares de los comicios en cuanto al cargo de gobernador, según las cifras hasta entonces tabuladas. Los resultados publicados fueron los siguientes: Carlos Romero Barceló, 733,370; Rafael Hernández Colón, 734,095; Rubén Berríos Martínez, 83,585; y Luis Lausell Hernández, 5,033. Se hizo constar que restaban por computarse los resultados de 25 unidades electorales correspondientes a 17 de los precintos electorales, escrutar aproximadamente 12,000 votos ausentes, y la adjudicación de 18,652 papeletas recusadas.

Por acuerdo, también unánime, adoptado por la Comisión el 7 de noviembre siguiente, y en aras de acelerar sus labores, decidió ésta efectuar el escrutinio general ordenado por ley en su Art. 6.008 (16 L.P.R.A. sec. 3268) mediante un conteo de votos papeleta por papeleta, en vez de a base de la comprobación de la corrección de las Actas de Colegio. Además, se acordó que los votos pendientes de adjudicación serían adjudicados durante ese proceso de escrutinio.

El 9 de noviembre, la Comisión reiteró su acuerdo original del día 5 de noviembre de 1980, en el sentido de comenzar en horas de la mañana del lunes 10 de noviembre el escrutinio general, según modificado. Por razón de que para el 9 de noviembre quedaban por adjudicar todavía los votos depositados en unas 12 urnas electorales —cuya adjudicación final dependía de una investigación—, se acordó realizar la refe-

rida adjudicación, conjuntamente con el escrutinio general. Se estimó que era necesario la comparecencia de los miembros de las comisiones locales de elecciones, correspondientes a las unidades en las cuales se habían depositado tales votos.

Subsiguientemente, ese mismo día el Comisionado Electoral del Partido Nuevo Progresista —quien inicialmente había votado a favor de tales acuerdos— solicitó que se reconsiderara la decisión de posponer la adjudicación de los votos ausentes pendientes de investigación. Propuso que no se iniciara el escrutinio general hasta que se adjudicaran todos los votos ausentes. Los Comisionados Electorales de los tres partidos de minoría votaron en contra de tal posposición. No mediando unanimidad de los miembros, el Administrador General de Elecciones, a tono con lo dispuesto en el Art. 1.014(e), 16 L.P.R.A. sec. 3014(e), decidió reconsiderar el acuerdo previo y ordenó la posposición del escrutinio general hasta que se completara la adjudicación de los votos ausentes.

No conforme con esa decisión, los Comisionados representantes de los partidos de minoría recurrieron en alzada ante la Junta Revisora Electoral, solicitando su revocación.

La Junta Revisora Electoral confirmó la decisión apelada y, a instancia propia, en su resolución recomendó y ordenó al Administrador que expidiera una nueva publicación en forma oficial del resultado de las elecciones generales celebradas el 4 de noviembre de 1980, una vez terminado el cómputo del voto ausente, independientemente de lo que pudiera surgir del escrutinio general o de cualquier impugnación de las elecciones. El Administrador inmediatamente suscribió y emitió documento denominado "Publicación Oficial del Resultado de las Elecciones Generales del 4 de noviembre de 1980" que reza:

En el día de hoy 10 de noviembre de 1980, la Comisión Estatal de Elecciones ha concluido el conteo de los votos ausentes emitidos conforme a los artículos 5.038 a 5.041 de la Ley Electoral de Puerto Rico. A tenor con las disposiciones pertinentes

de la Ley Electoral de Puerto Rico y de la Resolución de la Honorable Junta Revisora Electoral de fecha de 10 de noviembre de 1980 (JR-80-265), el Administrador General de Elecciones *publica al pueblo de Puerto Rico en forma oficial el resultado de las Elecciones Generales* celebradas el 4 de noviembre de 1980, en el Estado Libre Asociado de Puerto Rico. Dicho resultado arroja las siguientes cifras para el cargo a Gobernador:

| | |
|---|---:|
| Carlos Romero Barceló | 750,343 |
| Rafael Hernández Colón | 747,787 |
| Rubén Berríos Martínez | 88,121 |
| Luis Lausell Hernández | 5,179 |

El Escrutinio General se comenzará por la Comisión Estatal de Elecciones el día 11 de noviembre de 1980 y se espera concluir el mismo en aproximadamente seis (6) semanas.

En San Juan, Puerto Rico, hoy 10 de noviembre de 1980.

(Fdo.)

GERINELDO BARRETO PEREZ
Administrador General de
Elecciones

(Bastardillas nuestras.)

## II

La actuación de la Junta Revisora ha de examinarse tomando como fuente la Ley Electoral vigente aprobada por la Asamblea Legislativa, en virtud de la autoridad que le confiere el Art. VI, Sec. 4 de la Constitución. En virtud de ese estatuto, el Legislador escrupulosamente fijó un diseño básico específico regulatorio de los procedimientos posteriores a la votación y la ordenación de las labores de los distintos organismos electorales que intervienen en el reconocimiento y cómputo de votaciones, inclusive la Comisión Electoral.

Al reflexionar sobre los valores jurídicos y comunitarios que inspiraron esa ley, notamos que el esquema legislativo parte de tres importantes supuestos: (1) que las normas y reglas referentes a toda contienda electoral, y la forma de contar el sufragio, deben quedar establecidas previamente, de

manera que todos los candidatos y partidos políticos sepan a qué atenerse; (2) que no se introduzcan cambios posteriores que afecten adversamente tales reglas, concediendo ventajas impermisibles a unos sobre otros; y (3) que terminada la votación, se inicie rápidamente el conteo de votos, gestión que no debe detenerse ni dilatarse hasta que finalice con la certificación de los candidatos.

Este último supuesto, continuidad, es esencial para garantizar no sólo pulcritud electoral —evitando que se intervenga indebidamente con el material, o que por acción u omisión, se dañe o destruya— sino para brindar al electorado con premura los resultados, previniendo el desasosiego e incertidumbre natural que generan eventos de esta naturaleza, y minimizando las especulaciones y señalamientos —juiciosos o irresponsables— que tienden a mermar la confiabilidad del sistema electoral y los cimientos que sostienen la legitimidad de la democracia puertorriqueña.

■ Las distintas etapas visualizadas en la ley son: (1) comienzo del cómputo a nivel local; (2) resultado parcial preliminar; (3) escrutinio general; y (4) certificación de funcionarios electos, salvo que mediare recuento. Examinemos en detalle este trámite.

■ El conteo comienza de inmediato en la unidad más pequeña, a saber, la Junta de Colegio Electoral que ha estado desempeñándose en cada colegio durante el día de las elecciones. Una vez finalizada la votación, "los funcionarios del mismo procederán a efectuar el escrutinio de las papeletas". Éstas se clasificarán en cualesquiera de las siguientes categorías: íntegras, mixtas, recusadas, protestadas, no adjudicadas y en blanco. Los trabajos de escrutinio en esta etapa deberán continuar ininterrumpidamente hasta su final. Art. 6.001 (16 L.P.R.A. sec. 3261). Ninguna papeleta puede adjudicarse, a menos que medie unanimidad entre los inspectores de la Junta de Colegio Electoral. No habiendo ese consentimiento, la papeleta en cuestión se marca como "no adju-

dicada" y se remite para que sea evaluada por la Comisión Electoral. Art. 6.002 (16 L.P.R.A. sec. 3262).

Esta primera fase se lleva a cabo en todos los precintos de la isla de Puerto Rico, debiendo continuar ininterrumpidamente hasta su final. El resultado del escrutinio de cada colegio se reduce a escrito en un *Acta de Colegio Electoral*, firmado por todos los inspectores y representantes de partidos, quienes retienen una copia. Otra copia se fija en la puerta del colegio, y el original del acta y demás material electoral es enviado a la Comisión Electoral por conducto de la Comisión Local de Elecciones. Art. 6.006 (16 L.P.R.A. sec. 3266). Tales *actas* son las que sirven de base inicial para que la Comisión Electoral emita "el resultado preliminar de la elección", (1) y subsiguientemente realice el escrutinio general que, según el Art. 6.008, llevará a cabo "interviniendo con las papeletas no adjudicadas y las protestadas y contará o rechazará éstas, según lo que a su juicio se requiera por ley, continuando el mismo hasta su terminación". 16 L.P.R.A. sec. 3268.

Finalmente, el Administrador publicará el resultado del escrutinio general, según se declare por la Comisión. A base de ese resultado, se certificará debidamente electo el candidato que obtenga el mayor número de votos. En casos de empate, se sorteará el cargo. De haber una diferencia de 100 votos o medio por ciento ($\frac{1}{2}\%$) de los votos totales depositados, lo que sea menor, entre aspirantes a una misma posición, la Comisión llevará a cabo, a petición de cualquier candidato en la controversia, un recuento de los colegios que se le señalen, el que "tendrá el efecto de una acción de impugnación y no se certificará al ganador hasta efectuado el re-

---

(1) Resultados Parciales—"A medida que se reciban los resultados de los colegios electorales, la Comisión deberá combinar los mismos en forma tal que le permita emitir el resultado preliminar de la elección no más tarde de las doce del medio día de aquél siguiente a la elección. Dicho resultado preliminar deberá publicarse dentro de las setenta y dos (72) horas siguientes al día de la elección." Art. 6.007 (16 L.P.R.A. sec. 3267).

cuento . . .". Arts. 6.009, 6.010 y 6.011 (16 L.P.R.A. secs. 3269, 3270 y 3271).

Del procedimiento estatuido advertimos varias notas sobresalientes. *Primero*, el resultado preliminar o parcial de la elección, que la Comisión Electoral debe emitir "no más tarde de las doce del medio día de aquél siguiente a la elección", y publicar "dentro de las setenta y dos (72) horas siguientes", es una encomienda de carácter mandatorio, no directivo. Responde al deseo legítimo del Legislador de informar a la ciudadanía de manera inicial, aunque no definitiva, las resultancias comiciales habidas hasta ese momento. Por referirse al resultado de la elección, cubre razonablemente todos los puestos, no sólo la gobernación. Teóricamente y dependiendo de un número de factores —tales como el grado de precisión de los datos, celeridad con que son tramitados, facilidades físicas, capacidad personal, organización, y otros, incluso el margen amplio o estrecho de ventaja entre candidatos—, es concebible que dicho resultado preliminar pueda reflejar, al momento que se emite, las consecuencias finales de la elección.[2] Por su naturaleza limitada y parcial, sin embargo, no pueden atribuírsele efectos más allá de su ámbito. La palabra "parcial" es sinónimo de partitivo, incompleto, fraccionario o fragmentario. Por ende, ese resultado preliminar no es ni puede estimarse como una certificación. No crea estado definitivo de derecho alguno. *Segundo*, el escrutinio general exige que la Comisión pase juicio sobre las papeletas no adjudicadas y protestadas; "contará o rechazará éstas", dice la ley. Realizado de manera completa, sirve de base para certificar candidatos, pues es el primer cómputo que recoge *todos* los votos —según hemos visto, el preliminar no contempla la inclusión de papeletas no adjudicadas ni protestadas. Como consecuencia, hasta que ese organismo cum-

---

[2] Algunos de estos factores caen bajo el control de la Comisión y otros no. En determinadas circunstancias, estos factores pueden pesar en la determinación final.

pla con el deber ministerial de computar y adjudicar los votos, no podrá descargar adecuadamente su responsabilidad. *Tercero*, el escrutinio general, por las razones de interés público que reviste el elemento de continuidad antes apuntado, una vez comenzado, no puede paralizarse ni detenerse; continuará "hasta su terminación", según la ley.

## III

 Ante los términos del estatuto y los procedimientos en él establecidos por la Asamblea Legislativa, es evidente que cometió error la Junta Revisora Electoral al ordenar que se publicaran unos resultados —caracterizados como oficiales— sin que la Comisión pasara juicio sobre las papeletas no adjudicadas. Aparte de las instancias previstas en la ley en sus Arts. 6.007 y 6.008, *ante*, ésta no exige la publicación de resultados oficiales de las elecciones. (³) En la publicación impugnada se ha omitido considerar y contar papeletas, en franca violación de la ley, proclamándose unos resultados que no incluyen todos los votos. Se trata de una publicación in-

---

(³) El Administrador, en su comparecencia ante nosotros, admite que esta publicación no es la visualizada en el Art. 6.008, debido a que el escrutinio general no había comenzado para esa fecha. Arguye, no obstante, que resulta enteramente válida por cuanto constituye, en forma final, la publicación de los resultados preliminares, según autoriza el Art. 6.007, que incluye ahora, por primera vez, la computación de los votos ausentes, así como los votos de varias unidades electorales que para el 5 de noviembre no habían informado a la Comisión el resultado de la votación.

La dificultad de este argumento es que el Art. 6.007 dispone que los resultados preliminares *deberán* publicarse al "medio día de aquél siguiente a la elección . . .". La publicación del 10 de noviembre fue claramente efectuada, vencidos los términos antes mencionados. Intenta salvar este escollo el Administrador, diciendo que los términos aludidos son directivos y no mandatorios. Hemos concluido en contrario. Ahora bien, aun aceptando *argumenti gratia* que fuesen directivos, lo cierto es que los resultados preliminares los emite *la Comisión*, y no el Administrador, según dispone el referido Art. 6.007. El 10 de noviembre pasado, la Comisión no acordó hacer publicación alguna. El Administrador la hizo, en su capacidad individual, por recomendación errónea de la Junta Revisora. Dicho organismo apelativo tampoco tenía facultad en ley para ordenar la realización de un acto que era de estricta competencia de la Comisión.

completa que guarda cierta analogía con el conteo parcial de la publicación preliminar antes aludida, y ciertamente no refleja fielmente el "resultado de las Elecciones Generales celebradas el 4 de noviembre de 1980". Al presente, no existe ni puede existir certificación válida de candidatos triunfantes. El escrutinio general no ha terminado.

En su Moción Informativa de 13 de noviembre, el Administrador General de Elecciones solicita que se descontinúe por ahora el recuento papeleta por papeleta. No podemos acceder a esta solicitud. Confrontada con una elección de resultados cerrados que no permitían declarar con certeza la voluntad electoral manifestada en las urnas, la Comisión, al adoptar unánimemente el acuerdo —final y firme a esta fecha— de realizar el escrutinio general papeleta por papeleta, no hizo otra cosa que acatar el mandato legislado en el mencionado Art. 6.008 de la Ley Electoral, al efecto de que "[e]l escrutinio general de una elección se practicará usando las actas de colegio electoral y *todo otro documento* utilizado en el transcurso de la misma". (Énfasis nuestro.) El escrutinio general, así encauzado, debe proseguir con determinada y óptima diligencia. (⁴)

Resolvemos que la Junta Revisora no podía recomendar publicación oficial de resultados con independencia de lo que pudiere surgir del Escrutinio General al amparo del mencionado Art. 6.008, pues, no habiéndose realizado escrutinio general, no existía el supuesto de hecho necesario para la aplicación de dicho artículo. Se anulará, en consecuencia, la *Publicación Oficial del Resultado de las Elecciones Generales* emitida por el Administrador General de Elecciones el 10 de noviembre de 1980 e impugnada en estos recursos, en tanto en cuanto representa "en forma oficial el resultado de las Elecciones Generales".

---

(⁴) Adviértase que el Art. 1.013 de la Ley Electoral confiere a la Comisión amplias facultades para descargar eficientemente su encomienda "de estructurar e inspeccionar todos los procedimientos de naturaleza electoral" necesarios y congruentes con la propia ley. 16 L.P.R.A. sec. 3013.

## IV

Nuestro mandato estaría incompleto si, conforme a nuestra obligación constitucional y a los señalamientos de las partes, omitiéramos varios pronunciamientos adicionales.

El Tribunal no puede abstraerse de la confusión general y revuelo que han generado los cerrados resultados preliminares de las elecciones generales celebradas en Puerto Rico el día 4 de noviembre de 1980, que han sido anunciados oficialmente por la Comisión Estatal de Elecciones.

Compartimos el interés legislativo plasmado en la ley de que el recuento de los votos y la certificación de los candidatos ganadores finalice a la mayor brevedad. A tales efectos, notamos que el Administrador General y la Comisión Estatal de Elecciones han tomado y estudiado algunas medidas y contemplan adoptar otras medidas y providencias positivas en la consecución de ese fin, tales como el establecimiento de dos o más turnos diarios de trabajo; el funcionamiento de la Comisión Estatal de Elecciones en sesión permanente; la presencia de los Comisionados Electorales alternos durante todo el tiempo del recuento, al igual que la de los Comisionados Electorales en propiedad, de modo que aquéllos puedan trabajar y atender situaciones en el curso del recuento, cuando los Comisionados en propiedad se vean precisados a atender reuniones de la Comisión en pleno u otros asuntos; la accesibilidad de la Junta Revisora Electoral, para agilizar los procedimientos apelativos; la participación de los partidos políticos en la custodia y vigilancia del material, y la creación de una mesa especial, con funcionarios especializados, para atender las papeletas problemáticas.

Aunque no se nos ha planteado directamente por las personas afectadas que los organismos administrativos se hayan negado a tomar las medidas necesarias para acelerar el escrutinio general papeleta por papeleta de los votos totales depositados en las elecciones, a fin de que éste finalice dentro de un período razonable antes de la fecha de ley en que los

candidatos electos para los distintos cargos habrán de tomar posesión, ni que se hayan negado a proveer las medidas cautelares para la seguridad y limpieza del proceso de recuento, podemos percibir que existe inseguridad, intranquilidad y desasosiego entre los ciudadanos que se preocupan justificadamente por la integridad del voto depositado por cada elector.

A los fines de traer alguna tranquilidad al pueblo de Puerto Rico, este Tribunal hace un llamado firme a la Comisión Estatal de Elecciones, organismo oficial integrado por un Administrador General y un Comisionado Electoral en representación de cada uno de los partidos políticos principales, para que dentro del término de diez (10) días de la fecha de notificación de esta opinión, nos someta: (1) el plan detallado adoptado por la Comisión sobre el recuento general de los votos depositados, y (2) las medidas cautelares de seguridad que hayan adoptado para garantizar la seguridad y limpieza del proceso. Con el mismo vigor, invitamos a la Junta Revisora Electoral a actuar con la debida prontitud en la tramitación y resolución de los asuntos que le competen.

Luego de examinar la información requerida, el Tribunal determinará si se plantea alguna violación de derechos constitucionales de los electores, que los organismos oficiales no hubieren podido resolver y que requiera el ejercicio de nuestra función como guardianes de los derechos garantizados por la Constitución del Estado Libre Asociado de Puerto Rico.

El país está atravesando momentos de gran dificultad y tensión. En estas trabajosas circunstancias, es imprescindible que se actúe con serenidad y sensatez. Lo vital es que triunfe el pueblo entero de Puerto Rico; que no se reduzca la calidad de su democracia ni se mancille la limpieza de sus procesos electorales; que se respeten escrupulosamente nuestra Constitución y nuestras leyes. Hacemos un llamado al país para mantener en toda ocasión la máxima tranquilidad y mesura.

*Por las razones expuestas, se dictará Sentencia que revoque la Resolución de la Junta Revisora Electoral en cuanto a*

la *"Publicación Oficial del Resultado de las Elecciones Generales",* emitida el 10 de noviembre de 1980, y se ordenará a la Comisión Estatal de Elecciones y a su Administrador el cumplimiento de lo aquí dispuesto.